IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

EPCON INDUSTRIAL SYSTEMS, L.P.,    §
                                   §
          Plaintiff,               §
                                   §
v.                                 §          CIVIL ACTION NO. H-06-4123
                                   §
PROGRESSIVE DESIGN, INC.,          §
                                   §
          Defendant.               §

**MEMORANDUM OPINION**

Pending before the court[1] is Defendant's Motion to Dismiss for Lack of Personal Jurisdiction or, in the Alternative, to Transfer Venue (Docket Entry No. 9).  The court has considered the motion, all relevant filings, and the applicable law.  For the reasons set forth below, the court **DENIES** the motion.

## I.  Case Background

Plaintiff brought this breach of contract action against Defendant alleging a failure to pay amounts due under their agreement.  Plaintiff is a manufacturing company located in Texas. Defendant is an industrial engineering and design firm organized and located in Virginia.

In December 2004, Philip Morris USA, Inc., ("Philip Morris") contracted with Defendant to analyze problems with an industrial incinerator system in Philip Morris's Richmond, Virginia,

---

[1]    The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  Docket Entry Nos. 19, 21.

facility.[2]  After determining that the incinerator system should be
replaced, Defendant searched for a manufacturer with experience in
the field that could complete the project.[3]  Richard Fogg ("Fogg"),
Defendant's vice president of engineering, made the initial contact
with Plaintiff.[4]  Defendant sent Fogg, to examine Plaintiff's
plant, products, and operations.[5]  Ultimately, Defendant invited
three manufacturers, including Plaintiff, to make presentations to
Philip Morris in Virginia.[6]  Plaintiff traveled to Virginia for the
presentation.[7]

    During this time, Plaintiff and Defendant entered into a
separate manufacturer's representative agreement by which Defendant
agreed to represent Plaintiff in Virginia for a period of one

---

[2]    Defendant's Memorandum of Law in Support of its Motion to Dismiss
("Defendant's Memorandum"), Docket Entry No. 10, Ex. A, Declaration of Robert A.
Ranson, Jr., ¶ 4; Ex. B, Declaration of John W. Waddill, Jr., dated Jan. 21,
2007, ("Waddill's First Declaration"), ¶ 2.

[3]    Id. at Ex. A, Declaration of Robert A. Ranson, Jr., ¶ 5; Ex. B,
Waddill's First Declaration, ¶ 2; Ex. C, Declaration of Richard Fogg dated Jan.
22, 2007, ("Fogg's First Declaration"), ¶ 3.

[4]    Defendant's Reply to Plaintiff's Opposition to Defendant's Motion to
Dismiss ("Defendant's Reply"), Docket Entry 29, Ex. A, Declaration of Richard
Fogg dated Mar. 15, 2007, ("Fogg's Second Declaration"), ¶ 3; see also Affidavit
of Aziz A. Jamaluddin, Docket Entry No. 25, p. 4.

[5]    Affidavit of Aziz A. Jamaluddin, Docket Entry No. 25, p. 2; see also
Defendant's Memorandum, Docket Entry No. 10, Ex. C, Fogg's First Declaration,
¶ 6.

[6]    Defendant's Memorandum, Docket Entry No. 10, Ex. A, Declaration of
Robert A. Ranson, Jr., ¶¶ 5-6; Ex. B, Waddill's First Declaration, ¶¶ 2-3; see
also Affidavit of Aziz A. Jamaluddin, Docket Entry No. 25, p. 4.

[7]    Defendant's Memorandum, Docket Entry No. 10, Ex. A, Declaration of
Robert A. Ranson, Jr., ¶ 6; Ex. B, Waddill's First Declaration, ¶ 3.

year.[8]   Defendant  made  one  referral  to  Plaintiff  under  the
manufacturer's   representative   agreement,   but   no   sale   was
consummated.[9]   The agreement was not renewed at the close of its
year term.[10]

Philip   Morris,   with   Defendant's   concurrence,   selected
Plaintiff to manufacture the incinerator.[11]   Months later, Philip
Morris hired Defendant as the general contractor on the incinerator
replacement project.[12]   Under the general contract, Defendant was
to  engineer,  design,  procure,  install,  and  test  the  incinerator
system.[13]  Defendant then began negotiating the subcontract for the
manufacture  of  the  incinerator  with  Plaintiff.[14]   Negotiations
occurred via telephone, e-mail, and mail correspondence.[15]   At the

---

[8]     Id. at Ex. A, Declaration of Robert A. Ranson, Jr., ¶ 7; Ex. B,
Waddill's First Declaration, ¶ 4; see also Affidavit of Aziz A. Jamaluddin,
Docket Entry No. 25, p. 2.

[9]     Defendant's Memorandum, Docket Entry No. 10, Ex. A, Declaration of
Robert A. Ranson, Jr., ¶ 7; Ex. B, Waddill's First Declaration, ¶ 4.

[10]    Id. at Ex. A, Declaration of Robert A. Ranson, Jr., ¶ 7; Ex. B,
Waddill's First Declaration, ¶ 4.

[11]    Id. at Ex. A, Declaration of Robert A. Ranson, Jr., ¶ 6; Ex. B,
Waddill's First Declaration, ¶ 5.

[12]    Id. at Ex. A, Declaration of Robert A. Ranson, Jr., ¶ 9; Ex. B,
Waddill's First Declaration, ¶ 8.

[13]    Id. at Ex. A, Declaration of Robert A. Ranson, Jr., ¶ 9; Ex. B,
Waddill's First Declaration, ¶ 8.

[14]    Id. at Ex. A, Declaration of Robert A. Ranson, Jr., ¶ 10; Ex. B,
Waddill's First Declaration, ¶ 9.

[15]    Id. at Ex. A, Declaration of Robert A. Ranson, Jr., ¶ 10; Ex. B,
Waddill's First Declaration, ¶ 9.

time, Defendant expressed an interest in developing a continuing relationship with Plaintiff.[16]

The parties reached an agreement on the manufacture of the incinerator and held two kick-off meetings.[17]  The first was in Texas on January 12-13, 2006, at which time the parties executed the subcontract, and the second was in Virginia a few days later.[18] The subcontract provided that disputes related to the contract could be raised "at law or in equity[] in a Court of competent jurisdiction."[19]  The subcontract incorporated the contract between Defendant and Philip Morris, stating:

> Subcontractor [Plaintiff] shall be bound to the Contractor [Defendant] in the same manner, to the same extent, and with the same force and effect that the Contractor is bound to the Owner by all of the terms, provisions, general conditions and special conditions of the Prime Contract, except as may be expressly modified by this Subcontract.[20]

Although the subcontract itself did not contain a choice-of-law provision, the prime contract called for the application of

---

[16]    Affidavit of Aziz A. Jamaluddin, Docket Entry No. 25, p. 4.

[17]    Defendant's Memorandum, Docket Entry No. 10, Ex. B, Waddill's First Declaration, ¶ 10.

[18]    Id.; see also Ex. C, Fogg's First Declaration, ¶ 7; Affidavit of Aziz A. Jamaluddin, Docket Entry No. 25, p. 4.

[19]    Affidavit of Aziz A. Jamaluddin, Docket Entry No. 25, Ex. L, Subcontract Agreement, ¶ 7.

[20]    Id. at ¶ 1.

4

Virginia law to the "validity, interpretation, construction and performance of the [Prime] Contract."[21]

Plaintiff manufactured the incinerator at its facilities in Texas.[22]  In February 2006, Fogg, who had attended the Texas kick-off meeting, traveled to Texas again to "monitor the incoming raw materials for the incinerator system."[23]  He returned the next month "to monitor testing of the heat exchange component of the incinerator."[24]   Concerned about delays, Defendant sent its executive vice president and chief operating officer, John W. Waddill, Jr., ("Waddill") to Texas for two days in April 2006 to evaluate progress.[25]  In June 2006, Defendant sent Waddill, Fogg, and others to Plaintiff's facilities in Texas to inspect the incinerator while it was being manufactured.[26]   On two other occasions in June, an engineer employed by Defendant visited Texas to oversee electrical work.[27]   Fogg again visited Plaintiff's

---

[21]     Defendant's Memorandum, Docket Entry No. 10, Ex. D, contract between Defendant and Philip Morris, ¶ 24.7.

[22]     Defendant's Memorandum, Docket Entry No. 10, Ex. B, Waddill's First Declaration, ¶ 12.

[23]     Id. at Ex. C, Fogg's First Declaration, ¶ 8; Defendant's Reply, Docket Entry No. 29, Ex. A, Fogg's Second Declaration, ¶ 4.

[24]     Defendant's Memorandum, Docket Entry No. 10, Ex. C, Fogg's First Declaration, ¶ 9.

[25]     Id. at Ex. B, Waddill's First Declaration, ¶¶ 1, 14.

[26]     Id. at ¶ 15; Defendant's Reply, Docket Entry No. 29, Ex. A, Fogg's Second Declaration, ¶ 4.

[27]     Defendant's Memorandum, Docket Entry No. 10, Ex. B, Waddill's First Declaration, ¶ 15.

facilities in July "for pre-shipping testing of the incinerator system."[28]    Although Defendant coordinated its visits with Plaintiff, some were initiated solely by Defendant.[29]

During the visits by Defendant's employees, Plaintiff provided them with office space at its facilities and allowed them to use Plaintiff's telephones and computers.[30]  Plaintiff set up an e-mail account for Fogg.[31]  Fogg testified that, although he used a "spare desk in a common work area" while at Plaintiff's facilities, he did not "establish an office."[32]  He used his own laptop and cell phone, but accessed the internet through Plaintiff's service provider.[33] He was not aware that an e-mail account had been created for him.[34] Waddill stated that Defendant's employees made only minimal use of Plaintiff's phone system or internet provider.[35]

The parties disagree on the nature of Defendant's visits. Plaintiff lists Defendant's activities while in Texas to include

---

[28]    Id. at Ex. C, Fogg's First Declaration, ¶ 10; see also Affidavit of Aziz A. Jamaluddin, Docket Entry No. 25, p. 7.

[29]    See Affidavit of Aziz A. Jamaluddin, Docket Entry No. 25, p. 6; Defendant's Reply, Docket Entry No. 29, Ex. B, Declaration of John W. Waddill, Jr., dated Mar. 15, 2007, ("Waddill's Second Declaration"), ¶ 5.

[30]    Affidavit of Aziz A. Jamaluddin, Docket Entry No. 25, p. 3.

[31]    Id. at p. 5.

[32]    Defendant's Reply, Docket Entry No. 29, Ex. A, Fogg's Second Declaration, ¶ 5.

[33]    Id.

[34]    Id.

[35]    Id. at Ex. B, Waddill's Second Declaration at ¶ 6.

6

making engineering changes to the project, directing Plaintiff's employees in that regard, and directly overseeing the implementation of Defendant's design changes.[36]   According to Plaintiff, Defendant's representative who oversaw the electrical work directed Plaintiff's employees and made changes to the electrical engineering design while at Plaintiff's facilities.[37] Plaintiff's president stated that "[t]he design, manufacture and drawings were constantly subject to Mr. Fogg's approval."[38]

Fogg characterizes his role as follows:

> My role during my visits to Epcon was to observe Epcon's work on the incinerator to protect Progressive's interests in having the equipment it was purchasing from Epcon perform to Philip Morris's satisfaction.  While I did, out of necessity, point out to Epcon issues of substandard work on the incinerator system that needed to be corrected, the purpose of my visits was not to direct Epcon employees regarding engineering and design changes for the Project.[39]

As explained by Fogg, Defendant reviewed Plaintiff's work and made design changes in Virginia and observed the implementation of those designs on trips to Texas.[40]

---

[36]     Affidavit of Aziz A. Jamaluddin, Docket Entry No. 25, p. 3.

[37]     Id. at pp. 5-6.

[38]     Id. at p. 5.

[39]     Defendant's Reply, Docket Entry No. 29, Ex. A, Fogg's Second Declaration, ¶ 7; see also Ex. B, Waddill's Second Declaration, ¶ 7 (adding that the purpose also was not to conduct testing of the incinerator).

[40]     Id. at Ex. A, Fogg's Second Declaration, ¶ 8.

Throughout the manufacturing process, Plaintiff billed Defendant in increments with payments to be made to Plaintiff in Texas.[41] Defendant performed its payment obligation on four separate occasions.[42] The fifth invoice, dated May 16, 2006, required payment in the amount of $455,397.50, but Defendant paid only $200,000.[43]

Plaintiff shipped the incinerator system to Virginia in July 2006 and sent employees to oversee its installation and startup.[44] After the incinerator system was installed, multiple problems surfaced, which Defendant attributed to Plaintiff's work.[45] Plaintiff failed to address those problems to Defendant's satisfaction, and Philip Morris hired an independent consultant to evaluate the system.[46]

After Defendant continued to refuse to pay the remaining amount owed on the May 2006 invoice and subsequent invoices dated July 6, 2006, and September 8, 2006, Plaintiff filed this lawsuit

---

[41]   Notice of Removal, Docket Entry No. 1, Ex. 2, Plaintiff's Original Petition, p. 3; cf. also Affidavit of Aziz A. Jamaluddin, Docket Entry No. 25, Ex. K, invoice dated Oct. 17, 2006 (requiring payment to Texas).

[42]   Notice of Removal, Docket Entry No. 1, Ex. 2, Plaintiff's Original Petition, p. 3.

[43]   Id.

[44]   Defendant's Memorandum, Docket Entry No. 10, Ex. B, Waddill's First Declaration, ¶ 16.

[45]   Id. at Ex. A, Declaration of Robert A. Ranson, Jr., ¶¶ 12-13; Ex. B, Waddill's First Declaration, ¶ 17.

[46]   Id. at Ex. A, Declaration of Robert A. Ranson, Jr., ¶ 13; Ex. B, Waddill's First Declaration, ¶ 17.

in state court.[47]  Defendant did not answer Plaintiff's petition,
but, instead, removed the action to this court on December 29,
2006.  In addition to the notice of removal, Defendant filed
several other documents with this court, including an agreed motion
for extension of time, before raising personal jurisdiction in its
motion to dismiss or to transfer.

## II.  Motion to Dismiss

Defendant moves to dismiss this action on the basis that the
court lacks personal jurisdiction.

## A.  <u>Legal Standard</u>

The Federal Rules of Civil Procedure authorize a court to
dismiss an action against a defendant when the court lacks personal
jurisdiction over that defendant.  <u>See</u> Fed. R. Civ. P. 12(b)(2).
On a motion to dismiss, the burden is on the plaintiff to present
sufficient facts to establish a prima facie case in support of
jurisdiction.  <u>Revell v. Lidov</u>, 317 F.3d 467, 469 (5th Cir. 2002).
"[A] district court may consider 'affidavits, interrogatories,
depositions, oral testimony, or any combination of the recognized
methods of discovery.'"  <u>Id.</u> (quoting <u>Stuart v. Spademan</u>, 772 F.2d
1185, 1192 (5th Cir. 1985)).  The court resolves all conflicts in
favor of jurisdiction and accepts all of the plaintiff's
uncontroverted allegations.  <u>Revell</u>, 317 F.3d at 469; <u>see also Luv</u>

---

[47]    Notice of Removal, Docket Entry No. 1, Ex. 2, Plaintiff's Original
Petition, p. 3.

n' care, Ltd. v. Insta-Mix, Inc., 438 F.3d 465, 469 (5th Cir.),

cert. denied, ___ U.S. ___, 127 S. Ct. 21 (2006).

A federal court has personal jurisdiction over a nonresident

defendant if the forum state's long-arm statute confers

jurisdiction and if jurisdiction is consistent with due process

under the United States Constitution. Seiferth v. Helicopteros

Atuneros, Inc., 472 F.3d 266, 270 (5th Cir. 2006). In Texas, the

long-arm statute permits personal jurisdiction to full extent

allowed by the Due Process Clause. Revell, 317 F.3d at 469-70. In

turn, the Due Process Clause:

> permits the exercise of personal jurisdiction over a
> nonresident defendant when (1) that defendant has
> purposefully availed himself of the benefits and
> protections of the forum state by establishing "minimum
> contacts" with the forum state; and (2) the exercise of
> jurisdiction over that defendant does not offend
> "traditional notions of fair play and substantial
> justice."

Latshaw v. Johnston, 167 F.3d 208, 211 (5th Cir. 1999)(quoting Int'l

Shoe Co. v. Wash., 326 U.S. 310, 316 (1945)).

Minimum contacts are established with a state by a defendant

whose conduct and connection with that state are significant enough

that the defendant reasonably should anticipate being haled into

court in that state. Nuovo Pignone, SpA v. STORMAN ASIA M/V, 310

F.3d 374, 379 (5th Cir. 2002). Key to the court's analysis of

whether personal jurisdiction comports with traditional notions of

fair play and substantial justice are the following factors: "(1)

the defendant's burden; (2) the forum state's interests; (3) the

plaintiff's interest in convenient and effective relief; (4) the judicial system's interest in efficient resolution of controversies; and (5) the state's shared interest in furthering fundamental social policies." Ruston Gas Turbines, Inc. v. Donaldson Co., 9 F.3d 415, 421 (5th Cir. 1993).

Continuous and systematic contacts are grounds for the exercise of general jurisdiction over a nonresident defendant for any cause of action regardless of whether the claim arose from specific activity within the forum. Luv'n care, Ltd., 438 F.3d at 469; Cent. Freight Lines Inc. v. APA Transp. Corp., 322 F.3d 376, 381 (5th Cir. 2003). Specific jurisdiction may exist where the contacts are less pervasive if the asserted cause of action arises out of or is related to the defendant's contact with the forum. Luv'n care, Ltd., 438 F.3d at 469; Cent. Freight Lines Inc., 322 F.3d at 381. Only specific jurisdiction is implicated in this case. The Fifth Circuit employs a three-step analysis, which combines the due process and the specific jurisdiction considerations, to determine whether the court can exercise specific jurisdiction:

> (1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable.

11

Nuovo Pignone, SpA, 310 F.3d at 378; see also Seiferth, 472 F.3d at 271; Luv'n care, Ltd., 438 F.3d at 469.

**B.  Analysis**

Defendant argues that Plaintiff failed to establish that Defendant had sufficient contacts with Texas to justify specific jurisdiction and that the burden on Defendant to defend this action in a Texas court would be too great.  Defendant represents that it has no place of business, no employees, no agents or other representatives in Texas, that it does not maintain a registered agent in Texas, that it does not have a Certificate of Authority on file with the Secretary of the State of Texas, and that Defendant's only contacts with Texas relate to its business with Plaintiff.

Plaintiff counters that Defendant solicited business in Texas with Plaintiff, entered into two contracts with Plaintiff, contemplated ongoing business with Plaintiff, communicated via e-mail and mail with Plaintiff in Texas, traveled to Texas many times during the course of the disputed contract, and made payments to Plaintiff in Texas.  Plaintiff contends that these contacts are sufficient for the assertion of personal jurisdiction over Defendant for the present contract dispute.

Any of these contacts individually may not warrant the exercise of personal jurisdiction in a contract case; however, the Fifth Circuit considers the totality of circumstances in making the jurisdictional determination.  See Stuart, 772 F.2d at 1192 ("While

12

the number of contacts with a forum state is not determinative, it is indeed one of the relevant factors to be considered within the totality of the circumstances in assessing the propriety of exercising personal jurisdiction over a nonresident."). In Latshaw, the Fifth Circuit stated:

> Although a single act by the defendant directed at the forum state can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted, entering into a contract with an out-of-state party, without more, is not sufficient to establish minimum contacts. Rather, in a breach of contract case, to determine whether a party purposefully availed itself of a forum, a court must evaluate "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing . . . ."

Latshaw, 167 F.3d at 211 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 479 (5th Cir. 1985)).

Through the years, the Fifth Circuit has decided the personal jurisdiction question based on various combinations of contacts in contract cases. A review of a few of these cases provides significant guidance.

In 1983, the Fifth Circuit decided Hydrokinetics, Inc. v. Alaska Mechanical, Inc., 700 F.2d 1026 (5th Cir. 1983). There, the Fifth Circuit held that personal jurisdiction was lacking over a defendant corporation that agreed to purchase goods manufactured in the forum state, agreed to make payment for the goods in the forum state, communicated extensively with the plaintiff before contracting, and sent officers to the forum state twice, once to

inspect the facilities and once to resolve a dispute. Hydrokinetics, Inc., 700 F.2d at 1028-29. The opinion noted that the case involved a single transaction to which all of the defendant's contacts with the forum state related. Id. at 1029. The defendant did not regularly engage in business outside of its home state, and the transaction was initiated by and substantially negotiated with a representative of the plaintiff in the defendant's home state, even though it was formally executed in the forum state. Id. at 1029. The court also found it significant that a choice of law provision required the application of the law of the defendant's home state and that the products were delivered by the plaintiff to the defendant outside the forum state. Id. The court concluded that, "considering the totality of the facts of this case, the necessary inference of purposeful availment is not supported." Id. at 1029-30.

Two years later, the Fifth Circuit determined that the district court did not have jurisdiction over an individual defendant who entered into a contract with a resident of the forum state, shipped goods into the forum state for modification, exchanged letters and telephone calls with the plaintiffs, agreed to a choice-of-law provision selecting the law of the forum state, and mailed payments to the forum state. Stuart, 772 F.2d at 1192-1194. Opining that, in deciding personal jurisdiction, the quality of the contacts predominates over the number or timing of the

14

contacts, the Fifth Circuit found that the defendant's contacts did not meet the minimum contacts standard.  Id. at 1194.

Another Fifth Circuit case, Gundle Lining Construction Corp. v. Adams County Asphalt, Inc., 85 F.3d 201 (5th Cir. 1996), addressed whether contracting with a forum entity, mailing payments to that entity, and engaging in communications with the entity during negotiations and performance of the contract are sufficient to infer purposeful availment.  The key factor in the Fifth Circuit's analysis was a contract provision that allowed suit to be brought in the state in which labor was performed, services were rendered, or materials were furnished.  Id. at 206.  Although acknowledging that the provision was neither a choice-of-law clause nor a choice-of-forum clause, the court found that it "resemble[d] the latter."  Id.  Because labor on the contract was performed in the forum state, the exercise of personal jurisdiction over the nonresident defendant was not unreasonable.  Id.

A 1999 case also discussed the parameters of specific jurisdiction in a contract case.  See Electrosource, Inc. v. Horizon Battery Techs., Ltd., 176 F.3d 867 (5th Cir. 1999).  The Fifth Circuit found that, despite a choice-of-law provision selecting Indian law, Texas could exercise personal jurisdiction over a defendant who solicited a business relationship with the Texas plaintiff, contracted with the plaintiff, contemplated an ongoing relationship with the plaintiff, corresponded extensively

with the plaintiff, sent at least six different representatives on six visits to Texas related to the contract, and made payments to the plaintiff in Texas.  Id. at 872.  The court distinguished Hydrokinetics, Inc. on the basis of the quantity and quality of the contacts with the forum state.  See id. at 873.

A fifth case is also informative.  In Central Freight Lines Inc., 322 F.3d at 382, the nonresident defendant sent two representatives to the forum state for a preliminary meeting that ultimately led to negotiations and a long-term contract between the parties.  The parties negotiated the contract via telephone and written communications.  Id.  The contract did not contain a choice-of-law provision or a choice-of-forum provision.  Id. at 383.  The Fifth Circuit stated that the contacts with the forum state could not be "characterized as random, fortuitous, or attenuated."  Id. (internal quotation marks omitted).  Rather, the court found that the nonresident defendant knew that it was affiliating itself with a business based primarily in the forum state with customers from the forum state.  Id. at 382.  Even though the nonresident defendant, a freight delivery company, did not pick up or deliver freight in the forum state, it "took purposeful and affirmative action by entering into the [agreement], providing [the plaintiff] with pricing and shipping information, and agreeing to accept shipments" from the forum state "that had

16

the clearly foreseeable effect of causing business activity in the forum state." Id. (internal quotation marks omitted).

As helpful as these cases are, none has precisely the same set of circumstances as those that are presently before this court. Viewing the evidence in favor of jurisdiction as the court must, the record in this case shows that Defendant solicited Plaintiff's business on behalf of a third party, entered into a manufacturer's representative agreement, expressed an interest in developing an ongoing relationship, communicated extensively via e-mail, mail, and telephone with Plaintiff, entered into a manufacturing contract that was executed in Texas, traveled to Texas many times prior to and during the course of the relevant contract, and made payments to Texas. Moreover, during the trips to Texas, Defendant provided assistance and advice on design implementation that affected Plaintiff's performance of the contract.

At first blush, similarities between this case and Hydrokinetics, Inc. are striking; however, on closer inspection, the cases differ in a few significant ways. In Hydrokinetics, Inc., a third party initiated contact with the nonresident defendant on behalf of the plaintiff and brokered negotiations. Here, Defendant reached into Texas to pursue Plaintiff's business and concurred with Philip Morris' selection of Plaintiff for the

job.[48]  Additionally, the plaintiff and the nonresident defendant in Hydrokinetics, Inc. entered into a single transaction without any suggestion of future business interactions.  Plaintiff and Defendant, in this case, discussed a continuing relationship and entered into a second agreement that, although not at issue in this case, reflected a contemporaneous intention to continue relations. Finally, and most importantly, the nonresident defendant in Hydrokinetics, Inc. traveled to the forum state twice, once to inspect the plaintiff's facilities prior to contracting and once to resolve a dispute over the resulting product.  In contrast, Defendant sent many different representatives to Plaintiff's facility on no less than nine occasions.  Some of the visits lasted several days and featured Defendant's involvement in the manufacturing process.

The present facts more resemble those in Electrosource, Inc. because of the number of Defendant's visits to Texas, the degree of Defendant's involvement in the performance of the contract, and the apparent interest in developing an ongoing business relationship. Like the contract in Electrosource, Inc., the agreement here (by way of the incorporation of the prime contract terms) included a choice-of-law provision that pointed to the law of another

---

[48]    The nonresident defendant in Gundle Lining Construction Corp. was subject to personal jurisdiction even though it did not chose to do business with the plaintiff, but was required by the owner to subcontract with the plaintiff. In this case, Defendant was not forced to do business with Plaintiff, even though Philip Morris selected Plaintiff for the incinerator project.  Defendant requested Plaintiff's proposal and concurred with Philip Morris's decision.

jurisdiction.  As the Fifth Circuit noted in <u>Electrosource, Inc.</u>, the existence of a choice-of-law provision is entitled to some weight, but not determinative weight.  <u>Electrosource, Inc.</u>, 176 F.3d at 873; <u>see also</u> <u>Stuart</u>, 772 F.2d at 1195, 1196.  Other factors substantially outweigh the choice-of-law provision on the present facts, as in <u>Electrosource, Inc.</u>  Both the quantity of contacts, including extensive communications and multiple trips to Texas, and the quality of contacts, including the purposeful solicitation of Plaintiff's business and involvement in the manufacturing of the incinerator, overshadow what was essentially a default contract provision.[49]

The other cases discussed above, although not as closely aligned with this one on the facts, also support a finding of minimum contacts in this case.  The contacts in the <u>Stuart</u> case were less meaningful and included no contemplation of future business.  Unlike <u>Stuart</u>, Defendant in the present case was not merely a customer and the parties' interaction was not simply a sale.  In contrast to <u>Gundle Lining Construction Corp.</u>, the parties' contract here did not have any clause that resembles a choice-of-forum clause,[50] but Defendant's other contacts with Texas

---

[49]    The clause was essentially a default provision in that the subcontract's silence on the issue led to the incorporation of the choice-of-law clause from the prime contract.

[50]    The clause allowing suit to be brought in any court of competent jurisdiction cannot be said to be a forum-selection provision because it necessarily requires that the chosen court have jurisdiction, the issue under consideration here.

are more significant than those of the nonresident defendant's forum activities in that case.  Defendant's contacts are also more significant than those of the defendant in Central Freight Lines Inc., even though the ongoing nature of the parties' relationship is less pronounced here than in that case.  On balance, Defendant's conduct of reaching out to Texas exceeded that which would have alerted it to the possibility of being haled into court in Texas to resolve disputes with Plaintiff over the incinerator subcontract.

Having found minimum contacts, the court turns to the fairness factors.  Without a doubt, Defendant will face a burden in having to litigate in Texas.  The burden may be considerable, but it is not unfair.  Defendant voluntarily reached into Texas to do business with a Texas company and initiated numerous communications and trips during the performance of the contract.  Despite Defendant's focus on the number of visits Plaintiff made to Virginia, the burden on Defendant to litigate in Texas appears to be no greater than that on Plaintiff to litigate in Virginia.  As the case now stands, it is solely a breach of contract claim for the nonpayment of amounts due.  Texas certainly has a strong interest in litigating such causes of action when the party alleging harm is a Texas resident.  The third fairness factor, convenient and effective relief for Plaintiff, a Texas resident, also weighs in favor of this court's jurisdiction.  Therefore, even if the Eastern District of Virginia is a "Rocket Docket" that would

20

lead to a quicker resolution,[51] the bulk of the fairness factors favor continued litigation before this court.[52]

In consideration of the quality, nature, and extent of Defendant's contacts with Texas, the likelihood of consequences within Texas from Defendant's actions outside of the state, and the connection between Defendant's activities in Texas and Plaintiff's claims, the court finds that Defendant purposefully availed itself of the benefits and protections of Texas.  Exercising personal jurisdiction over Defendant in no way offends traditional notions of fair play and substantial justice.  Defendant is subject to the court's in personam jurisdiction.

### III.  Motion to Transfer Venue

In the alternative to dismissal, Defendant moves the court to transfer this action to the Eastern District of Virginia pursuant to 28 U.S.C. § 1404(a) for the convenience of the parties and witnesses.

### A.  Legal Standard

A district court may transfer any civil action to any other district where the case might have been brought, if transfer serves "the convenience of parties and witnesses . . . [and is] in the interest of justice."  28 U.S.C. § 1404(a); see also Van Dusen v.

---

[51]    This case is before the undersigned on consent and can be heard as expediently as the parties can prepare it.

[52]    The fifth factor related to interstate social policies appears to have no application and has not been addressed by the parties.

21

Barrack, 376 U.S. 612, 616 (1964); In re Volkswagen AG, 371 F.3d 201, 203 (5th Cir. 2004).   The party seeking the transfer must demonstrate that the balance of convenience and justice factors favors a change of venue.   Time, Inc. v. Manning, 366 F.2d 690, 698 (5th Cir. 1966).   The decision whether to transfer venue rests within the sound discretion of the district court.   Casarez v. Burlington N./Santa Fe Co., 193 F.3d 334, 339 (5th Cir. 1999).

In balancing the convenience and justice factors, the court takes into consideration various private and public interest factors in light of the specific facts of the case.   Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988); In re Volkswagen AG, 371 F.3d at 203.   The private concerns include:  "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive."   In re Volkswagen AG, 371 F.3d at 203; see also Edge Petroleum Operating Co. v. Duke Energy Trading & Mktg., L.L.C., 311 B.R. 740, 743 (S.D. Tex. 2003)(adding the plaintiff's choice of forum, the availability and convenience of the witnesses and parties, the place of the alleged wrong, and the possibility of delay and prejudice upon transfer).   Public interest factors that may be relevant to the analysis include: (1) administrative difficulties related to court congestion; (2) the local interest in

deciding the controversy; (3) the familiarity of the forum with the applicable law; and 4) the avoidance of unnecessary conflict of laws problems.   In re Volkswagen AG, 371 F.3d at 203.

**B.   <u>Analysis</u>**

The parties apparently agree that Plaintiff could have brought the case in Virginia, but disagree on the weight of the convenience and justice factors.   The majority of Defendant's argument focuses on how much more convenient the Virginia forum would be for litigation of the defenses it plans to raise in the case.   Because Defendant has not answered, none of those issues are before the court at this time.   Even assuming that Defendant does plead defenses that include "problems with the incinerator system that Plaintiff has not properly addressed and for which Progressive has incurred significant expense,"[53] transferring the case only shifts the witness problem and other burdens from Defendant to Plaintiff.

Defendant suggests that it will have many witnesses outside of its employ who could not be subpoenaed to appear in this court. Plaintiff counters that it, too, would need to call third parties to testify in response to Defendant's defense witnesses.   Defendant discounts the necessity of the witnesses Plaintiff speculates it may need to call.   Without the benefit of an answer, the court cannot discern the breadth of Defendant's defenses and cannot determine whether either party will need to call all of the

---

[53]     Defendant's Memorandum, Docket Entry No. 10, p. 19.

23

witnesses it lists in its brief.  The reality is either party will be in a bind when it comes to nonparty witnesses if the trial is not held in that party's home forum.

Without citation to any legal authority, Defendant contends, "It was Plaintiff's decision to bring this lawsuit, thus the expense that it may incur to pay for its employees to travel to Virginia should not weigh as heavily as the expense that Progressive would incur to bring its employees to Texas to defend Plaintiff's claims."[54]  In reality, the decision to bring a lawsuit in a particular forum is not a liability to the plaintiff in the transfer analysis.  Although neither conclusive nor determinative, a plaintiff's choice of forum is a factor weighing against transfer.  See In re Horseshoe Entm't, 337 F.3d 429, 434 (5th Cir. 2003); Time, Inc., 366 F.2d at 698.

The court is not concerned that the incinerator itself is now in Virginia.  Contrary to Defendant's assertion, the court can foresee no need to view the incinerator in person in order to resolve this breach of contract action.  The evidence of significance to this case more likely will consist of documents, including the subcontract, invoices, and communications between the parties, that elucidate the contractual obligations of the parties.  No doubt, both parties have relevant documents at their home locations.  In a technological age like this, transporting

---

[54]     Id. at pp. 18-19.

documents, even a massive amount, can be accomplished without significant difficulty.

According to Defendant, transferring the case will lead to an easy, expeditious, and inexpensive resolution, in part, because the case is in the relatively early stages and, in part, because the Eastern District of Virginia is known for the speed with which it moves cases through the court system. As to the first, the court agrees that very little substantive work has been done on this case. As to the second, that court takes judicial notice of the Eastern District of Virginia's efforts to move cases quickly. Yet, transferring the case will cause some delay, even if minimal. Moreover, as this is a consent case, the speed with which it moves is largely in the hands of the parties themselves. The application of Virginia law will cause no difficulty or delay.

Because the incinerator is now in Virginia and "the problems with Plaintiff's incinerator system were also felt in Richmond, Virginia, not in Texas[,]" Defendant argues, Virginia has a greater interest in deciding the case.[55]  Of course, when a party to a contract causes economic injury to a Texas company, as alleged here, it is in the interest of Texas to have its courts resolve the dispute.

On balance, the factors weigh neither in favor nor against transfer. Thus, Defendant has failed to meet its burden of

---

[55]     Id. at p. 21.

25

demonstrating that convenience and justice factors favor a change of venue.  The court finds no reason to disturb Plaintiff's choice of forum in this case.

### IV.  Conclusion

Based on the foregoing, the court **DENIES** Defendant's Motion to Dismiss for Lack of Personal Jurisdiction or, in the Alternative, to Transfer Venue.

**SIGNED** in Houston, Texas, this 25th day of April, 2007.


_____
Nancy K. Johnson
United States Magistrate Judge